# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

## TAMPA DIVISION

Case No.:_____

ANNETTE HAYES,
CHERYL MCGRORY,
ROBERT COBLEIGH,
MAZDI RANDERIA,
and LESLIE CUMMING,
individually, and on behalf of
all others similarly situated,

      Plaintiffs,

      v.

TONY JAMES MICHAEL KELLY, a Florida individual,
LIFELINE INNOVATIONS & INSURANCE SOLUTIONS LLC,
a Wyoming limited liability company,
JOHN ALBINO MARQUES, a California individual, and
GREGORY TALBOT, a California individual,

      Defendants.

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Annette Hayes, Cheryl McGrory, Robert Cobleigh, Mazdi Randeria, and Leslie Cumming, on behalf of themselves and all others similarly situated, sue Tony James Michael Kelly, a Florida individual ("Kelly"), Lifeline Innovations & Insurance Solutions LLC, a Wyoming limited liability company ("Lifeline Innovations"), John Albino Marques ("Marques"), a California individual, and Gregory Talbot ("Talbot"), a California individual, and state:

## **INTRODUCTION**

1.      EquiAlt, LLC, along with prominent aiders and abettors, including Chief Investment Officer Kelly, and sales agents Lifeline Innovations, Marques, and Talbot (the "Lifeline Defendants"), defrauded over one thousand investors across the country, mostly senior citizens, out of much of their life savings. Kelly, Lifeline Innovations, Marques, and Talbot (collectively, "Defendants") were instrumental in helping EquiAlt brazenly operate a "Ponzi" scheme formed around various real estate investment trusts that raised over $170 million of investor money. EquiAlt and Defendants falsely represented that these investments were legal, conservative and would generate substantial returns, knowing none of that was true. Instead, EquiAlt, with the aid and assistance of Defendants, misappropriated and misused their investors' money, paid substantial commissions to the Lifeline Defendants, and, in classic Ponzi scheme fashion, used money generated by later investments to make it appear to initial investors that the investments were paying the promised returns when, in fact, the investments were quickly losing money. The real property owned and invested in by EquiAlt on behalf of the investors is currently valued by EquiAlt at $145 million—no doubt a grossly inflated estimate and not enough to pay back Plaintiffs' and the Class Members' invested principal and owed interest. The Securities and Exchange Commission ("SEC") took notice, and on February 11, 2020, it filed a civil enforcement action against EquiAlt, EquiAlt principals Brian Davison and Barry Rybicki (the "EquiAlt Principals"), and the EquiAlt funds, alleging violations of the Securities Act of 1933 and Securities Exchange Act of 1934 (the "SEC Action").  The District Court judge in that action has already granted SEC's request to appoint a receiver.

2.      Plaintiffs bring this action on behalf of themselves and a Nationwide class and California subclass (the "Classes") of investors in EquiAlt and its real estate investment funds,

EquiAlt Fund 1, EquiAlt Fund 2, EquiAlt Fund 3, EA SIP Fund, (collectively, the " EquiAlt Funds"), to recover losses suffered as a result of fraud committed by EquiAlt, which was aided and assisted by EquiAlt Chief Investment Officer Defendant Kelly, as well as the Lifeline Defendants, which acted as sales agents for Equialt, and to recover any and all other losses suffered as a result of the fraud.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Defendants because Defendant Kelly, a Florida resident, was involved in the marketing and sale of unregistered securities offered by EquiAlt and conducted such business out of EquiAlt's office in Tampa, Florida; and because the Lifeline Defendants were involved in the solicitation and sale of securities by Florida-based EquiAlt. As such, Defendants live in Florida and/or have purposefully availed themselves of the laws of the State of Florida and have established minimum contacts with the State of Florida.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiffs' and the Class members' claims occurred within this District. In addition, Defendant Kelly is a resident of this district and operated out of the EquiAlt office in Tampa, Florida.

## PARTIES

6.      **Plaintiff Annette Hayes** is an individual who now, and at all times mentioned herein, resides in the State of California. Hayes invested in EquiAlt, as described more fully below.

7.     **Plaintiff Cheryl McGrory** is an individual who now, and at all times mentioned herein, resides in the State of California. McGrory invested in EquiAlt, as described more fully below.

8.     **Plaintiff Robert Cobleigh** is an individual who now, and at all times mentioned herein, resides in the State of California. Cobleigh invested in EquiAlt, as described more fully below.

9.     **Plaintiff Mazdi Randeria** is an individual who now, and at all times mentioned herein, resides in the State of California. Randeria invested in EquiAlt, as described more fully below.

10.    **Plaintiff Leslie Cumming** is an individual who now, and at all times mentioned herein, resides in the State of California. Cumming invested in EquiAlt, as described more fully below.

11.    **Defendant Tony James Michael Kelly** is an individual who now, and at all times mentioned herein, resides in the State of Florida. Kelly was the Chief Investment Officer for EquiAlt and worked out of EquiAlt's Tampa office as the right hand of Brian Davison, its owner and Chief Executive Officer. Kelly was intimately aware of and knowingly aided and abetted the Ponzi scheme perpetrated by EquiAlt and the EquiAlt Principals.

12.    **Defendant Lifeline Innovations** is a Wyoming corporation with its principal place of business in Walnut Creek, California.

13.    **Defendant John Albino Marques** is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Marques serves as the President, Chief Executive Officer, and Senior Account Executive of Defendant Lifeline Innovations.

14.    **Defendant Gregory Talbot** is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Talbot serves as the Vice President of Lifeline Innovations.

15.    Through their business, Lifeline Innovations, the Lifeline Defendants acted as broker-dealers for EquiAlt and extended the reach of the EquiAlt Ponzi scheme throughout the state of California by distributing sales materials to solicit investments in EquiAlt, processing investment applications, and communicating with investors in California regarding the state of their investments.  Upon information and belief, the Lifeline Defendants were involved in and received commissions for each investment in the EquiAlt Funds from investors residing in the State of California.

## GENERAL FACTUAL ALLEGATIONS

### A. **EquiAlt and its Investment Products**

16.    EquiAlt represented in its marketing materials that it owned several revenue-generating real estate properties, including condominiums and multi-family homes. The private placement memorandum ("PPM") for the EquiAlt Funds boasted that the Funds would generate revenue by buying properties in distressed real estate markets in the U.S. and take advantage of certain lending opportunities. EquiAlt's marketing materials lured investors with claims that "EquiAlt Has NEVER Lost Investor Dollars Since Inception," that there is "NO DEBT – No Third Party Risk," that is has a "Conservative underwriting methodology," and that it is "Currently operating three successful private placement funds." Marketing materials further boast that EquiAlt has a "depth of experience in Real Estate lending markets," and has engaged in "over 1000 successful transactions."

17. Brian Davison formed EquiAlt in 2011 and had signature authority over EquiAlt's bank accounts. Barry Rybicki managed EquiAlt's relationships with various unlicensed sales agents and licensed sales agents, including the Lifeline Defendants, who acted as broker-dealers in selling the Funds' securities. EquiAlt's primary business was to direct or indirectly manage all day-to-day operations of the Funds, including the solicitation of investors through entities and individuals like the Lifeline Defendants, and all accounting and financial activities for the Funds.

18. The Lifeline Defendants were instrumental in soliciting investments in the EquiAlt Funds from individuals who, like Plaintiffs, resided and operated in the State of California. The Lifeline Defendants were an integral part of the overall EquiAlt scheme. EquiAlt paid the Lifeline Defendants for soliciting investments, distributing sales materials, processing investment applications, and keeping investors apprised of the state of their investments.

19. By enticing Plaintiffs and the Classes with its claims, EquiAlt raised over $170 million between January 2010 and November 2019 through the sale of fixed rate debentures issued by the EquiAlt Funds. The EquiAlt debentures are securities within the meaning of California Corporations Code section 25019.

20. EquiAlt's offerings were limited to 3-year or 4-year term debentures of the EquiAlt Funds that promised a fixed annual return of 8% to 10%. The Equialt Debentures were never traded on any national exchange. Indeed, EquiAlt fraudulently and improperly claimed its securities were exempt from registration under state or federal law.

21. Upon information and belief, DLA Piper prepared and/or assisted and approved the EquiAlt Debentures' offering materials. DLA Piper is listed as the "Legal" service provider

in a brochure created by EquiAlt concerning "Alternative Investment Strategies." DLA Piper promoted its involvement in advising EquiAlt.[1]

22.　　And in a Bloomberg Law webpage published in 2018, the webpage notes:

> DLA Piper said it advised Tampa-based specialized investment management firm EquiAlt LLC in the formation and offering of its recently formed $500 million fund that purchases and develops properties within "qualified opportunity zones" in Florida and other jurisdictions. (*DLAPiper.com*)[2]

23.　　Many of the Class Members preyed on by EquiAlt, Kelly and the Lifeline Defendants are elderly, retired, and used their IRAs to fund their participation in the Funds. EquiAlt's marketing materials expressly suggested that investors can use their retirement accounts to invest into the fund:

**Can I use my 401k / IRA retirement account to invest into the fund?**

Yes, the account is moved into a self-directing retirement account which is than [sic] invested into EquiAlt Fund LLC. The process is simple, a form is filled out, and the money is transferred to the self-directed IRA account and then invested into EquiAlt Fund LLC. The process is handled this way to make sure there are no tax complications or charges.

24.　　Many of the Class Members duped by EquiAlt, Kelly and the Lifeline Defendants are unaccredited or unsophisticated investors who were attracted by false representations that EquiAlt's "successful" Funds were "secure," "safe," "low risk" and "conservative" and with assurances that it could not go bankrupt. Many Class Members lack knowledge and expertise in financial or business matters, were unable to evaluate the merits and risks of the investment and were not otherwise capable of bearing the economic risk of the investment.

---

[1] Upon information and belief, information on DLA Piper's website pertaining to its involvement in advising EquiAlt has been removed.

[2] *https://news.bloomberglaw.com/business-and-practice/wake-up-call-facing-federal-probe-national-enquirer-publisher-changes-top-lawyer*

25.     EquiAlt aggressively solicited investments from older citizens and the general public with cold calls, campaigns, social media, websites, and in person meetings through its in-house employees, unlicensed external sales agents, and licensed external sales agents such as the Lifeline Defendants.

26.     Kelly and the Lifeline Defendants aided and assisted EquiAlt in misleading these Class Members about the substantial commissions paid to market these investments. While the PPM provided to many investors stated that the EquiAlt Funds *may* pay commissions or fees to registered broker/dealers or other financial intermediaries, the EquiAlt Funds *always* paid substantial commissions of anywhere between 10% and 14%. Indeed, many of the subscription agreements stated that investments were being sold *without* commissions. Instead, over several years, the Funds paid commissions totaling approximately $24 million, using investor money.

**B.  Defendants' Fraudulent Conduct**

27.     A Ponzi scheme or pyramid scheme is a type of investment fraud where the operators of the scheme create the false impression of return on investment by paying off early investors with proceeds obtained from later investors rather than legitimate investment returns. That is exactly what happened here. EquiAlt lured investors with false promises of guaranteed returns and used money from new investors to pay older investors and used money from one EquiAlt Fund to purchase real estate for another EquiAlt Fund.

28.     While this fraud allowed EquiAlt to obtain new money from Plaintiffs and the Class Members and provide the appearance of success, in actuality the Funds themselves have been abysmal investments. Contrary to what Defendants told Plaintiffs and the Class, the Funds have suffered significant financial losses and are currently deep in the red.

29.     Some of those who dealt with EquiAlt professionally caught on.   Upon information and belief, Wells Fargo Bank had been providing banking services to EquiAlt for several years when, at some point, it sought to meet with EquiAlt to discuss its accounts. That meeting never took place. Instead, EquiAlt terminated its relationship with Wells Fargo.

30.     The EquiAlt Principals stole millions of dollars from the EquiAlt Funds. They lived lavish lives, purchased expensive cars and watches, and chartered private jets. Davison spent an estimated $2.7 million on these items and took $1.8 million in cash distributions from the EquiAlt Funds to pay personal back income taxes.

31.     Between 2017 and 2018, the EquiAlt Principals took improper cash distributions totaling more than $11 million from the Funds. In 2019, they took improper cash distributions from the Funds of $6.1 million and $1.2 million, respectively; purportedly for repayment of loans to the Funds. Kelly also received improper commissions while working at EquiAlt.

32.     The EquiAlt Principals also misused millions of Plaintiffs' and Class Members' investment dollars several distinct ways. The PPM for EquiAlt Fund 1 and EquiAlt Fund 2 state that investor money would be used to purchase, own, improve and/or sell real property. The PPM for each of these funds included a detailed chart of "projected sources and uses of cash," and identified six specific uses of that cash, including: investments in property, accounting and tax preparation, legal costs, investor relations and communications expenses, marketing and sponsorship event fees, and miscellaneous expenses and reserves. While the PPM for these Funds state that "All uses of proceeds are estimated and subject to change," only the above six specific uses of investor proceeds are delineated in the document. An example of one of the charts included in the PPM for EquiAlt Fund 1 is set forth below:

| SOURCES: | | |
|---|---|---|
| Debentures: | | |
| TOTAL SOURCES: | | $50,000,000.00 |

| USES: | |
|---|---|
| Investment in Property | $45,000,000.00 |
| Accounting and Tax Preparation | $550,000.00 |
| Legal Costs | $250,000.00 |
| Investor Relations and Communications Expenses | $2,500,000.00 |
| Marketing and Sponsorship Event Fees | $200,000.00 |
| Miscellaneous Expenses and Reserves | $1,500,000.00 |
| TOTAL USES: | $50,000,000.00 |

33.     EquiAlt ignored the restrictions of use in the PPMs and misused Plaintiffs' and Class Members' money by: using money from one Fund to pay back investors in another Fund; paying substantial undisclosed commissions to unregistered sales agents; charging substantial undisclosed fees such as due diligence fees, management fees, success fees, auction fees, underwriting fees, purchase discount fees, and bonuses, payable to EquiAlt and Davison; and making improper distributions of cash to the EquiAlt Principals. EquiAlt continuously misused millions of dollars of Class Member money in these ways over several years.

**C.  EquiAlt's Misrepresentations and Omissions to Plaintiffs and the Classes**

34.     EquiAlt, with the aid and assistance of Kelly and the Lifeline Defendants, misrepresented to Plaintiffs and the Classes how their money would be used by the EquiAlt Funds. As shown *supra*, the PPM notes that approximately 90% of investor funds would be used to "invest in property." The actual number was less than 50%. Instead, a substantial part of investor money was used to pay millions of dollars in fees and bonuses to EquiAlt and others. EquiAlt failed to disclose any of this in their offering documents or marketing materials.

35.     While the PPMs for EquiAlt Fund 1 and EquiAlt Fund 2 disclosed a list of specific uses of investor funds, they said nothing of how the EquiAlt Funds would use millions of dollars of Plaintiffs' and Class Members' money to pay EquiAlt extraneous fees. A particularly egregious example is a "discount fee": In cases where the purchase price was better than the listed sales price for real property, EquiAlt paid itself the difference. Thus EquiAlt, not the Classes, reaped that benefit.

36.     Plaintiffs and the Classes were also never informed that more than $6.61 million of their money would be commingled among the different EquiAlt Funds to pay debts and obligations. For example, $2.37 million was transferred from EquiAlt Funds 1 and 2 to another EquiAlt Fund (EquiAlt Fund III, LLC), which then used that money to pay approximately $2.3 million in principal and interest to its investors. EquiAlt would have been unable to make its scheduled payments without that transfer.

37.     The PPMs also failed to adequately disclose to Plaintiffs and the Classes the nature and extent of commissions that would be paid. While the PPM stated that the EquiAlt Funds *may* pay commissions or fees to registered broker, dealers or other financial intermediaries, and while many of the subscription agreements signed by Rybicki stated that investments were being sold *without* commissions, the EquiAlt Funds *always* paid substantial commissions of anywhere between 10% and 14%. The Lifeline Defendants reaped such benefits.

38.     Management fees were another area in which Plaintiffs and the Classes were misled. Although many Class Members were expressly told that no management fees would be paid, EquiAlt and Davison received more than $6.67 million in such fees. While the PPMs for all Funds stated that there would be management fees, this directly contradicted EquiAlt's representations in writing that EquiAlt Fund 2 would not have any such fees.

39.     EquiAlt, with the aid and assistance of Kelly and the Lifeline Defendants, falsely represented to Plaintiffs and the Classes that their investments were "low risk," "safe," and "conservative," and provided at least an 8% yield. EquiAlt even represented that the Funds had "never lost investor dollars since inception." Despite that, the investments were far from low risk, safe or conservative, and suffered significant financial losses through their inception.

40.     While neither EquiAlt nor any of the EquiAlt funds have ever been registered with the SEC, EquiAlt falsely represented to investors in at least EquiAlt Fund 2 that it had been registered since 2009.

41.     EquiAlt also falsely represented to Plaintiffs and the Classes that payments would be paid to licensed brokers and/or finders. Indeed, during a period of several years the EquiAlt Funds and BR Support Services, LLC paid millions of dollars in commissions to unlicensed and licensed sales agents encouraged by EquiAlt to sell EquiAlt Funds.

42.     Plaintiffs and the Classes were further misled about the people who would manage the Funds. Upon information and belief, at least two versions of the PPM for Fund 1 and Fund 2 identified EquiAlt's Chief Financial Officer as "DD," a CPA with an MBA degree who supposedly had experience with a Big Four accounting firm with SEC reporting requirements, as a CFO of a $100 million real estate mortgage and title company, and as an author. No such person ever served as EquiAlt's CFO.

D.  **The Debentures Were Illegal Unregistered Securities**

43.     California law prohibits any person from selling or offering to sell unregistered securities such as the EquiAlt debentures. *See* California Corp. Code § 25110. Persons who violate this statute are liable to defrauded investors (*see* California Corp. Code, § 25503) as are

persons who materially assist the primary violator (*see* California Corp. Code §§ 25503, 25504, and 25504.1).

44.     Florida law also prohibits any person from selling or offering to sell unregistered securities within Florida unless the security is a federal covered security or falls within exemptions codified in FL ST §§ 517.051, 517.061. FL ST § 517.211 provides a private right of action to investors who have been harmed by a violation of FL ST § 517.01.

45.     The EquiAlt debentures were not properly registered or qualified for offer or sale either with any federal or state regulator. EquiAlt, with the aid and assistance of Kelly and the Lifeline Defendants, unlawfully offered its EquiAlt debentures for sale and sold them as unregistered securities under federal and state laws.

46.     While the EquiAlt claimed the debentures are exempt from registration, that is false.  The Form D's EquiAlt and/or the Funds filed with the SEC claimed exemption pursuant to Rule 506(b) of Regulation D, a "safe harbor" provision. But, the EquiAlt debentures were not exempt under Rule 506(b) because they were sold to more than 35 non-accredited investors. The EquiAlt debentures were also not exempt because they were marketed to the public through general solicitations and advertising and sold to non-accredited investors. EquiAlt and the Funds also violated Rule 506(b) of Regulation D by failing to disclose in their Form D the compensation arrangements and personal use of funds, as described above.

### E.  Plaintiffs' Experiences

#### a.  Annette Hayes

47.     On November 28, 2018 Hayes purchased a $160,000 investment with EquiAlt Fund 1 at an annual rate of 8% with a 48-month term. Payments to Hayes were to be made monthly beginning on January 1, 2019.  On December 21, 2018, Hayes purchased an additional

$190,000 investment with EquiAlt Fund 1, also at an annual rate of 8% with a 48-month term, for a combined investment of $350,000.  Payments were to be made monthly starting January 15, 2019**.**

48.      Upon information and belief, Hayes' investments were facilitated by the Lifeline Defendants through an intermediary agent.

49.      In a letter Hayes received dated January 8, 2020 regarding "Wind down of EquiAlt Fund LLC," EquiAlt stated that it would be closing EquiAlt Fund LLC and that it would "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor principle [sic] starting in Q1 2020."   The Letter contains many misrepresentations about the EquiAlt Fund, including:

  a)   "We are pleased that the Fund has been successful and has achieved its goals."

  b)   "Management estimates that the Fund is solvent as a stand-alone entity."

  c)   "Management estimates that the value of the assets exceeds the liabilities against the fund."

The Letter concludes by explaining that the EquiAlt Fund would be wound down over a period of 18 months. Monthly payments from EquiAlt to Hayes ceased after February 2020.

### b.  Cheryl McGrory

50.      On December 21, 2018, McGrory purchased a $200,000 investment with EquiAlt Fund 1, at an annual rate of 8% with a 48-month term. Monthly payments were to be made to McGrory beginning on February 2019.

51.      Upon information and belief, McGrory's investment was facilitated by the Lifeline Defendants through an intermediary agent.

52.     In a letter McGrory received dated January 8, 2020 regarding "Wind down of EquiAlt Fund LLC," EquiAlt stated that it would be closing EquiAlt Fund LLC and that it would "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor principle [sic] starting in Q1 2020."   The Letter contains many misrepresentations about the EquiAlt Fund, including:

a)   "We are pleased that the Fund has been successful and has achieved its goals."

b)   "Management estimates that the Fund is solvent as a stand-alone entity."

c)   "Management estimates that the value of the assets exceeds the liabilities against the fund."

The Letter concludes by explaining that the EquiAlt Fund would be wound down over a period of 18 months.   Monthly payments from EquiAlt to McGrory ceased after February 2020.

### c.   Robert Cobleigh

53.     On September 20, 2019, Cobleigh purchased a $270,000 investment with EquiAlt Fund 2, at an annual rate of 8% with a 48-month term. Payments were to be made to Cobleigh annually beginning in October 2020.   On November 14, 2019, Cobleigh purchased an additional $250,000 investment with EquiAlt Fund 1, also at an annual rate of 8% with a 4-year term, for a combined investment of $520,000. Payments were to be made monthly starting November 2020. These documents are signed by both Cobleigh and Rybicki, on behalf of EquiAlt Fund.

54.     Upon information and belief, Cobleigh's investments were facilitated by the Lifeline Defendants through an intermediary agent.

55.     In a letter Cobleigh received dated January 8, 2020 regarding "Wind down of EquiAlt Fund LLC," EquiAlt stated that it would be closing EquiAlt Fund LLC and that it would "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor

principle [sic] starting in Q1 2020."   The Letter contains many misrepresentations about the EquiAlt Fund, including:

a)  "We are pleased that the Fund has been successful and has achieved its goals."

b)  "Management estimates that the Fund is solvent as a stand-alone entity."

c)  "Management estimates that the value of the assets exceeds the liabilities against the fund."

The Letter concludes by explaining that the EquiAlt Fund would be wound down over a period of 18 months.

### d.  Mazdi Randeria

56.     On April 24, 2019, Randeria purchased an $80,000 investment with EquiAlt Fund 1, at an annual rate of 8% with a 48-month term. Payments to Randeria were to be made monthly beginning in June 2019.

57.     Upon information and belief, Randeria's investment was facilitated by the Lifeline Defendants through an intermediary agent.

58.     Randeria also executed a Subscription Agreement with EquiAlt in connection with his $80,000 investment. In that Subscription Agreement, Randeria purchased 8,000 units of Class A membership interest of at a cost of $10 per unit.

59.     In a letter Randeria received dated January 8, 2020 regarding "Wind down of EquiAlt Fund LLC," EquiAlt stated that it would be closing EquiAlt Fund LLC and that it would "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor principle [sic] starting in Q1 2020."   The Letter contains many misrepresentations about the EquiAlt Fund, including:

a)  "We are pleased that the Fund has been successful and has achieved its goals."

b) "Management estimates that the Fund is solvent as a stand-alone entity."

c) "Management estimates that the value of the assets exceeds the liabilities against the fund.

The Letter concludes by explaining that the EquiAlt Fund would be wound down over a period of 18 months.  Monthly payments from EquiAlt to Randeria ceased after February 2020.

### e.  Leslie Cumming

60.     On June 11, 2019, Cumming purchased a $100,000 investment with EquiAlt Fund 1, at an annual rate of 8% with a 48-month term. Payments were to be made monthly beginning on August 1, 2019.

61.     Upon information and belief, Cumming's investment was facilitated by the Lifeline Defendants through an intermediary agent.

62.     Cumming also executed a Subscription Agreement with EquiAlt in connection with her $100,000 investment. In that Subscription Agreement, Cumming purchased 10,000 units at a cost of $10 per unit for an aggregate purchase price of $100,000.

63.     In a letter Cumming received dated January 8, 2020 regarding "Wind down of EquiAlt Fund LLC," EquiAlt stated that it would be closing EquiAlt Fund LLC and that it would "begin the shift of activities to facilitating the sale of the fund's assets to repay all investor principle [sic] starting in Q1 2020."   The Letter contains many misrepresentations about the EquiAlt Fund, including:

a) "We are pleased that the Fund has been successful and has achieved its goals."

b) "Management estimates that the Fund is solvent as a stand-alone entity."

c) "Management estimates that the value of the assets exceeds the liabilities against the fund.

The Letter concludes by explaining that the EquiAlt Fund would be wound down over a period of 18 months.  Monthly payments from EquiAlt to Cumming ceased after February 2020.

**F.  Discovery Rule and Fraudulent Concealment Doctrine**

64.     Between 2016 and January 2020, EquiAlt, with the aid and assistance of Kelly and the Lifeline Defendants, actively solicited Plaintiffs and the Class Members orally and in writing with false assurances of EquiAlt and the Funds' financial stability. Up until the SEC Action was filed on February 11, 2020, Plaintiffs and the Classes poured money into the EquiAlt funds in response to Defendants' positive assurances concerning the financial vitality of EquiAlt and the EquiAlt Funds.

65.     Plaintiffs and the Classes continued to invest money into the EquiAlt Funds because they were unaware of the securities violations, the EquiAlt Funds' insolvency, or the fact that EquiAlt was operating a Ponzi scheme. Plaintiffs and the Classes had no reason to suspect wrongdoing, injury, or anything worse than general market fluctuations and conditions.

66.     Plaintiffs and the Classes were further prevented from suspecting wrongdoing because of assurances through a series of investor reports.

67.     As described *supra*, in January 2020, EquiAlt sent the letter concerning the winding down of Fund 1. This letter falsely represented that EquiAlt Fund 1 was solvent, was achieving its goals, and that Plaintiffs and the Classes would be paid back. EquiAlt Fund 1 was, however, insolvent. Upon information and belief, EquiAlt sought to keep investor money by making similar false representations.

68.     Plaintiffs and the Classes allege that, based on the false and misleading information fed to them, and the material information concealed from them by Defendants, under California's discovery rule they did not discover and did not have reason to discover their causes

of action relating to the EquiAlt Ponzi scheme until February 11, 2020, at the earliest. Prior to that date, Plaintiffs and the other investors did not have a reasonable factual basis to suspect that they had been harmed through any breach of fiduciary duty, fraud, or violations of California's securities laws.

69.     Alternatively, under California's fraudulent concealment doctrine, the limitations period was likewise tolled at least through February 11, 2020, based on the active deceptive conduct of EquiAlt and Defendants in concealing Plaintiffs' and the Class Members' causes of action.

70.     Conditioned upon the receipt of the rescissionary relief accord under the California Securities Act, Plaintiffs tender their EquiAlt Debentures to Defendants.

## **CLASS ALLEGATIONS**

71.     Plaintiffs bring their claims on behalf of themselves and the following Nationwide and California Subclass: The Nationwide Class:   All persons who purchased an EquiAlt debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment; the California Subclass:  All persons residing in the State of California who purchased an EquiAlt debenture issued by any of the EquiAlt Funds, whether new or by reinvestment, that have not been fully repaid their principal investment. (Collectively, "the Classes"). Excluded from the Classes are Defendants and their parents, subsidiaries and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Nationwide Class and the California Subclass based upon subsequently discovered information and reserve the right to establish additional subclasses where appropriate.

72.     Certification of the Nationwide Class and California Subclass is proper under the Federal Rules of Civil Procedure. All of the criteria required by Rule 23 are satisfied here.

73.    **Numerosity:** The Classes are so numerous that joinder of all members is impracticable, especially in light of the SEC's estimation that over 1,100 persons have purchased EquiAlt's unregistered securities, many of them California residents.

74.    **Commonality:** There are common questions of law and fact as to all members of the Classes and those common questions predominate over any issues affecting only individual members of the Classes. Those common questions include:

a.   whether the Defendants violated the California Securities Act;

b.   whether the EquiAlt Debentures were exempt from registration;

c.   whether the Defendants are liable for the offer and sale of unregistered securities;

d.   whether Kelly is a "control person" of EquiAlt and/or the Funds;

e.   whether the Lifeline Defendants are "broker-dealers" of the EquiAlt Funds;

f.   whether the Defendants engaged in negligent misrepresentations concerning EquiAlt and the EquiAlt Debentures;

g.   whether statements made by Defendants to investors in the PPMs misrepresented material facts about the business and operations of EquiAlt and the Funds;

h.   whether Defendants engaged in deceptive, unfair, unlawful and/or fraudulent business practices under California law;

i.   whether Defendants engaged in conduct that violated the Florida Deceptive and Unfair Trade Practices Act;

j.   whether Plaintiffs and Class members are entitled to recessionary relief, damages or other forms of relief available under the California Securities Act;

k.   whether Plaintiffs and Class members are entitled to other equitable relief.

75.     **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Class have been subjected to the same unlawful, deceptive and improper practices and have been damaged in the same manner thereby.

76.     **Adequacy of Representation:** Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

77.     Plaintiffs have engaged the services of the undersigned counsel.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

78.     **Predominance:** The questions of law or fact common to the claim of each member of the Classes predominate over any question of law or fact affecting only individual members of the Classes. Class representation is superior to other available methods, as concentrating this litigation in this forum will avoid burdening the courts with individual lawsuits.  In the absence of a class action, individual actions will present a potential for inconsistent or contradictory judgments.  Class treatment of common questions of law and fact would also be superior to individual actions as class treatment will promote judicial economy of the court, conserve the resources of litigants, and promote consistency and efficiency of adjudication.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201-.213**

**Against All Defendants**

**(On behalf of the Nationwide Class)**

79.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully stated herein.

80.     Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes ("FDUTPA").

81.     At all relevant times Plaintiffs and members of the Class were "consumers" within the meaning of FDUTPA. F.S.A. § 501.203(7).

82.     Defendants' conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

83.     The EquiAlt investments sold to Plaintiffs and members of the Class are "things of value" within the meaning of FDUTPA. F.S.A. § 501.203(9).

84.     As alleged herein, Defendants' conduct violates the FDUTPA for the following reasons:

a) Defendants provided, disseminated, marketed, and otherwise distributed false and misleading information about the EquiAlt debentures, including information regarding their risk, success, and compliance with law;

b) Defendants falsely represented that EquiAlt has never lost investor dollars since its inception;

c)   Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the debentures, which did, or tended to, mislead Plaintiffs and members of the Class about facts that could not reasonably be known by a consumer; and

d)   Defendants failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner.

85.    Defendants' unfair practices as described herein occurred substantially in the State of Florida.

86.    Defendants' unfair practices as described herein offend established public policy, are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, including Plaintiffs and members of the Class.

87.    Defendants caused Plaintiffs and members of the Class to suffer a probability of confusion concerning the Equialt debentures' success, risk, and compliance with the law.

88.    Defendants failed to reveal material facts to Plaintiffs and members of the Class with the intent that they rely upon such omissions.

89.    Defendants made material representations and statements of fact to Plaintiffs and members of the Class that resulted in their reasonably believing that the represented or suggested state of affairs was other than what it actually was.

90.    Defendants intended that Plaintiffs and members of the Class rely on their misrepresentations and omissions, so that Plaintiffs and members of the Class would purchase the EquiAlt debentures

91.     Had Plaintiffs and members of the Class known that EquiAlt's debentures were not low-risk, unsuccessful, in violation of the law, and part of Defendants' Ponzi scheme, Plaintiffs and members of the Class would not have made such investments.

92.     Plaintiffs and members of the Class did not receive the benefits of their bargain as a result of Defendants' misconduct.

93.     The foregoing acts, omissions and practices directly and proximately caused Plaintiffs and members of the Class to suffer actual damages.  EquiAlt, with the aid and assistance of Kelly and the Lifeline Defendants, misused and misappropriated investment principal and Plaintiffs have therefore lost money, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

## SECOND CLAIM FOR RELIEF

**Negligent Misrepresentation Against All Defendants**

**(On behalf of the Nationwide Class)**

94.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully stated herein.

95.     Defendants, in the course of their business, profession, and employment, and as part of transactions in which they had a pecuniary interest, misrepresented or omitted material facts in purporting to supply information to Plaintiffs for their guidance in purchasing the EquiAlt Debentures.

96.     Defendants intended that Plaintiffs rely on the information and provided it for that purpose.

97.     Defendants failed to exercise reasonable care or competence in obtaining and communicating the misrepresented and/or omitted facts to Plaintiffs.

98.     Plaintiffs justifiably relied upon Defendants' false misrepresentations and omissions in entering into the respective EquiAlt Debentures.

99.     As a direct and proximate result of Defendants' misrepresentations and omissions, and Plaintiffs' reliance thereon, Plaintiffs suffered direct and consequential losses, including the loss of their principal and interest under the EquiAlt Debentures.

100.    As a consequence of their negligent misrepresentations, Defendants are jointly and severally liable for actual damages, in an amount to be proven at trial, punitive damages, the costs of collection, litigation expenses, and recoverable costs, and pre- and post-judgment interest at the maximum prevailing statutory rate.

## THIRD CLAIM FOR RELIEF

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq***

**Against All Defendants**

**(On behalf of the California Subclass)**

101.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully stated herein.

102.    The California Unfair Competition Law ("UCL"), Business and Professions Code section 17200 *et seq*. prohibits any "unlawful, unfair, or fraudulent business act or practices." As described herein, Defendants have engaged in unlawful, fraudulent and unfair business acts and practices in violation of the UCL.

103.    Defendants' conduct in soliciting and selling investments in the EquiAlt Funds constitute unlawful business acts or practices because they violate California securities laws, including, but not limited to, Cal. Corp. Code §§ 25401, 25110, 25210, as well as the common law.

104.     Defendants' solicitations and marketing of its investments constitute fraudulent business acts or practices.  EquiAlt's claims, which Defendants aided and assisted in relaying to Plaintiffs and members of the Class, that "EquiAlt Has NEVER Lost Investor Dollars Since Inception," that there is "NO DEBT – No Third Party Risk," that it has a "Conservative underwriting methodology," that it is "Currently operating three successful private placement funds," as well as other representations regarding the risk of its investments, were false, misleading, and likely to deceive the public, including Plaintiffs and members of the Class.

105.     Defendant Kelly's receipt of improper commissions constitutes unfair business acts or practices because Kelly's conduct was unethical and injurious to consumers.

106.     Plaintiffs and members of the Class relied on the reasonable expectation that EquiAlt's investment offerings were in compliance with the law.  Plaintiffs and member of the Class also relied on EquiAlt's representations about the risk and success of its investments.

107.     Plaintiffs and members of the Class have suffered an ascertainable and pecuniary loss as a direct and proximate result of EquiAlt's misrepresentations and their concealment of and failure to disclose material information because Plaintiffs invested and lost money based on Defendants' violations of the UCL. Defendants siphoned off Plaintiffs' investment principal for unlawful purposes and Plaintiffs have therefore lost that money.

108.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203, and for such other relief set forth below.

## **FOURTH CLAIM FOR RELIEF**

### **California Statutory Securities Fraud Against All Defendants**

### **(On behalf of the California Subclass)**

109.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully stated herein.

110.     The investments EquiAlt sold to Plaintiffs are "securities" under Cal. Corp. Code § 25019.

111.     The Lifeline Defendants are "broker-dealers" under Cal. Corp. Code § 25044.

112.     In connection with the offer and sale of those securities, Kelly and the Lifeline Defendants directly or indirectly made untrue statements of material fact or and omitted material facts, making the representations misleading, in violation of Cal. Corp. Code § 25401.

113.     Kelly is jointly and severally liable as a control person of EquiAlt and the EquiAlt Funds pursuant to Cal. Corp. Code. § 25504. At all material times, Kelly had the legal authority to control the actions of EquiAlt, the EquiAlt Funds, and the employees.

114.     The Lifeline Defendants are also jointly and severally liable under Cal. Corp. Code. § 25504.1 as they each materially aided in the acts constituting the securities fraud violations with the intent to deceive or defraud Plaintiffs.

115.     Plaintiffs have been damaged by the securities fraud described herein since that fraud has caused their losses.

116.     Having violated California securities law, Defendants are jointly and severally liable for damages and interest at the legal rate, pursuant to Cal. Corp. Code § 25501, and costs.

## FIFTH CLAIM FOR RELIEF

**Sale of Unregistered Securities, Cal Corp. Code § 25110, Against the Lifeline Defendants**
**(On behalf of the California Subclass)**

117.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully stated herein.

118.    The Lifeline Defendants offered and/or sold securities in the form of the EquiAlt Debentures within or from the State of California.

119.    The securities were not registered or exempt from registration. Accordingly, their offer and sale in California was unlawful under California Corp. Code § 25110.

120.    As a consequence of their sale of unregistered securities, the Lifeline Defendants are liable, jointly and severally, for damages and interest at the legal rate, pursuant to Cal. Corp. Code § 25503, and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for an order and judgment against Defendants and in their favor as follows:

A.  An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.  An Order enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful conduct and practices alleged herein;

C.  An Order awarding Plaintiffs and the Classes rescission;

D.  An Order awarding Plaintiffs and the Classes restitution with interest at the legal rate;

E.  An Order awarding Plaintiffs and the Classes monetary damages and interest at the legal rate;

F.  An Order awarding Plaintiffs and the Classes the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

G.  An Order awarding pre- and post-judgment interest; and

H.  An Order granting such other and further relief as is just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiffs hereby request a trial by jury on all issues.

Dated: April 22, 2020

/s/ David S. Casey, Jr.
David S. Casey, Jr., Esq.
(*Pro Hac Vice to be filed*)
 *dcasey@cglaw.com*
James M. Davis, Esq.
(*Pro Hac Vice to be filed*)
jdavis@cglaw.com
CASEY GERRY SCHENK
 FRANCAVILLA BLATT &
PENFIELD, LLP
*Attorneys for Plaintiffs*
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Respectfully submitted,

RUSSOMANNO & BORRELLO, P.A.
*Attorneys for Plaintiffs*
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103

By: /s/ Herman J. Russomanno
     Herman J. Russomanno
     Fla. Bar No. 240346
     hrussomanno@russomanno.com
     Robert J. Borrello
     Fla. Bar No. 764485
     rborrello@russomanno.com
     Herman J. Russomanno III
     Fla. Bar No. 21249
     herman2@russomanno.com